Good morning, Your Honors. Herbert Godel appearing on behalf of Pyramid Technologies. The right to a jury trial is probably one of the most fundamental and justly protected rights that we have provided by our Constitution. And that is why the rules prohibiting judges from taking certain actions are there. Judges are not permitted to weigh the evidence. Judges can only really decide summary judgment cases if there's no question about material facts and issues of law. Judge Stotler basically weighed the testimony of various witnesses. She originally excluded the expert witness reports, claiming that she couldn't read them. We sent back copies, and they were large enough that, like the letter E, when you go to the doctor's office, it would have been enough to read that one pretty easy. The fact is there was a conflict between the experts. You know, the Rule 702 really talks about the criteria for experts. There's nothing in this record that would show that either of these three expert witnesses that were pyramids witnesses. Let me get to the point as to what my colleagues' concerns are, but let me tell you what my concern is. Okay. Let's suppose that I thought that Judge Stotler had been a little stingy in her rulings on the experts, and I was willing to admit everything. Okay. Okay. Where's the causal link? Where is the evidence that the leak, that the moisture caused the damage to these electronic components in the warehouse? Well, I was going to address that on the question of whether you even needed experts on some of this, because we had eyeball recipient witness testimony, including former employees who were there, and saw condensation on the packaging. Okay. The employees saw the condensation, and what does that prove? It proves that there is a possibility, a factual possibility, that this condensation either got into the packaging or caused enough damage where customers, and WMS Gaming was originally going to buy all this stuff, saw and was made aware of that. I don't think WMS, I don't think the gaming company gets you anyplace, because there's no contract with them. Their perceptions are not what the insurance is based on. The insurance is not going to insure you against the perceptions of customers that your products aren't viable. Okay. Well, if you're looking at strictly causation. Yeah, on causation. Didn't your expert, Podoluski, testify on deposition that at least some corrosion occurred because of the high humidity caused by the August 2005 flood? That's at the excerpt of record 465 to 466. Yes. And by the way, what do I do with the fact that that came in in deposition, even though his expert report may have been excluded by the trial judge? Isn't that deposition testimony still, you know, that has not been stricken, I believe. No. In fact, that's one of the issues I wanted to address is that Judge Stotler excluded certain evidence, but not all of it. Podoluski's deposition was taken by Hartford. They took the deposition. They asked him the question. They didn't object to his conclusion, which was very clearly that this could have happened. There's no dispute that there was corrosion on some of this equipment. So would he have been testified as a fact witness at that point as opposed to an expert witness? If he was not recognized as an expert by the judge, then what is the status of that deposition testimony? Well, he's not precipitating because he didn't do the physical inspection himself. Petluski didn't even go on. Petluski was never on site, was he? No, he wasn't. He didn't examine anything. All he was doing was looking at the Kumar report. He was looking at the Kumar report, and he was asked the question by counsel on causation. And he said yes, based on his knowledge and experience, which makes him kind of an expert. And how does that help you if he wasn't acknowledged as an expert by the court? Well, you have to break it down to whether he's an expert or a precipient. He should have been allowed to testify as an expert. His testimony was never stricken. His report may have been stricken, but his testimony was never stricken. And there were plenty of witnesses. There were at least three people. Even the claims file shows. As a matter of fact, he wasn't rejected as an expert. I mean, Spiegel was and Mortenson was. But my understanding was that Petluski, he was not rejected as an expert. That's right. He wasn't. And, therefore, he is an accepted expert by the district court. He did testify in deposition based upon his understanding, based upon the other condition, not personal observation, that the corrosion at the humidity levels that was there, the corrosion was caused by the 2005 flood. Well, he was asked basically a hypothetical question. It was presented to him, as you present questions to experts all the time, on a hypothetical basis. Where in the record did the district court accept him as an expert? It didn't accept him as an expert. It just basically ignored what Petluski had to say and didn't consider it as a fact. A material fact that should have been considered by a jury. I thought there was representation that he was accepted as an expert. He wasn't. I don't think he was accepted or rejected. I think basically she rejected certain experts, Mortenson and Spiegel, but she didn't reject Petluski. Is that right? She didn't reject Petluski. But she didn't acknowledge him as an expert either. She didn't do anything. She initially rejected him because she couldn't read it. Right. And then you provided a more legible copy. Counsel, I'm having a lot of problems with your WMS gaming business interruption claim. And let me tell you why so you can respond to my concerns. I see in the record that Carmine Greco, the senior buyer for WMS, said that the purchase was subject to approval by WMS Quality Control, among other things. Yeah. Nick Savage, the WMS Quality Control manager, testified at that position that if he knew that Pyramid did not have humidity control in its warehouse, that fact alone would have disqualified Pyramid as a supplier. And I think it's undisputed that Pyramid did not have humidity control in its warehouse. Why doesn't that make, as a matter of law, any business interruption claim of WMS gaming unreasonably speculative? Because you have an intervening event. What Mr. Greco said at his deposition was that if Hartford would have tested the equipment, and the tests had been done by a competent, qualified laboratory, he would have bought it. So the fact that it was not in a temperature-controlled environment before that really is not relevant because he was physically there. I thought he said he would have bought it subject to WMS giving quality control. And then when we get WMS Quality Control, Nick Savage, he said it would have been a disqualifying event, the fact that there wasn't humidity control in the warehouse, even if there had never been a flood. That may have been true, but for the fact that he was physically there, he saw it and he said to Klingerman, okay, look, I'm not going to buy it because I'm concerned. whether it was concerned by the flood itself or the fact there was no humidity control. He then said to Klingerman, look, if you'll test it and bring it to a legitimate laboratory and it's okay, we will buy it. So it kind of superseded whatever had previously been there. But I want to, if I may, I want to move on to the bad faith allegations, if I can, with the Court's permission. Bad faith conduct is almost always a question of fact. We have a number of very significant facts in this case. One, it was a failure to investigate this claim, which is an immediate violation of the implied covenant of good faith and fair dealing. They made a lowball offer of about $6,000 for property, and then about 10 months later said, okay, we're wrong. It's going to be $90,000, which is 14 times what they originally offered. And then it took five months to pay what they had agreed to pay. That cannot possibly rise to the level where the Court can say as a matter of law there's insufficient evidence to go to a jury on the question of the conduct of the bad faith. The fact they didn't test it for over two years. Well, they sent Spiegel out within days. Spiegel was Pyramid's person. That was Pyramid's person? Yeah. I'm sorry. Spiegel was Pyramid's person, and they hired Spiegel. I'm sorry. I'm sorry. I meant Belfour. Yeah, Belfour. Belfour is a – yeah, I don't want to make – demean it, but I took Belfour – I took Helm's deposition. He didn't know what these parts were. He didn't know what functions they performed. He did nothing. He did no testing whatsoever. Himself, he did no testing whatsoever. He wrote his report. Okay. So – and I agree that the Belfour report doesn't look like very much. It's nothing. But it is sent out. They do send him out within, what, two, three days of the incident. Actually, it was a week. Instead of doing something when you have a major loss like this, and you're talking about the potential of a $5 million policy or a loss, you don't wait a week to send the adjuster out. And he didn't send a local adjuster. Hartford's everywhere. They could have sent a local person to do it. They brought a guy in from Kansas City who brought a guy in from Texas to come out to the place. The report from Belfour was about eight or nine days after the actual event took place. By then, things had really changed. It was only because they were getting resistance from Hartford that they went out and hired Spiegel and ultimately the public adjusters because they weren't getting anywhere. Klingerman first said he was going to test it, and then he changed his mind. The reason was pretty simple. The cost of testing, which we later found out, was about $14 million. So they have a $5 million policy. They're not going to spend $14 million testing each one of these little widgets. So they refused to test it at all. Their obligation as an insurer is to do an investigation and find out if there's sufficient causation, number one, and are there really damages. And since you touched on the question of causation, it seems to me that just as a lay person, if I was going into a place to buy something and I saw a moisture-sensitive product, by the way, these are on computers, they're on airplanes or whatever, and I saw that there was water, condensation is water, on the packaging, I'm getting concerned. I'm not so sure I want to buy that. That's physical damage. That's not an abstract. That's absolute physical evidence that there was damage. She should have let that go to the jury. That's for the jury to decide, not for her. She decided she didn't like this case, and that's putting it in its perspective. And so instead of allowing the testimony to be weighed by a jury, she basically did the weighing. She didn't like one expert, and she did like the others. And that's not permitted. And then ---- Counsel, may I ask you, when thinking about Mr. Pelutsky's testimony, how to pronounce it? I think it's hard to pronounce it, but Pelutsky is the way I think I heard him say it. Pelutsky. How did his deposition testimony differ, if at all, from the contents of his report? I think he was asked more questions at the deposition than he was in his report. His report mainly, as I recall it, was to attack the methodology used by Kumar, mainly. But he was asked specifically by counsel for Hartford, well, could this have been caused by the humidity and the infusion of the water? And he said, yes. And that testimony was never stricken. It was admitted. Was it the same thing he said in the report? The nuance, I suppose. The question was asked directly. It was more hypothetical. And there he was physically, so he was able to answer that. But in both his deposition, he's very, very specific when he's asked, you know, what happened here? He says, well, in my opinion, the condensation caused the corrosion. Of course, he's never examined the parts. He's never been to the warehouse. All he's doing is looking at the Kumar report. In his written report, he says that without more information, nobody can tell, which is basically what Dr. Kumar says. Dr. Kumar says, I mean, I think very fairly and pretty evenhandedly, might have been, there might have been something caused, but nobody can tell at this point without further evidence, and we don't have that evidence. I'd like to reserve my remaining two minutes and some odds, but let me just answer your question first, of course. The fact of the matter is, if you don't know, and one person is saying it could be, and the other person is saying it could be, and it definitely was corrosion. There was no question about any of that. The leads and everything were all there. You leave that to the jury. You don't have to judge. You leave that to the jury to decide whether it was caused? To decide whether they believe it was. Yeah. But there isn't anybody here who can testify that it caused, that it actually caused the damage. Well, I think that the jury, even if they're lay people, can certainly evaluate the facts that are given to them, the physical evidence that was there. There isn't any expert who can say with any certainty that the corrosion was caused by the incident. Well, I think the facts are for the jury to determine. The court cannot weigh that testimony and decide as a matter of law that it was or wasn't. That's why we have a jury. I'd like to reserve my remaining 1 minute and 19 seconds. Thank you. All right. Thank you, Counsel. Good morning, Your Honors. Miriam Vogel and Porfi Patel of Morrison & Forrester for Hartford Insurance Company. I think the Court clearly understands the issue, and that is there is no evidence of causation. Excuse me. I'm losing my voice this morning. No evidence of causation by either expert testimony or a percipient witness. What about the Petluski deposition? His deposition was that he thinks that the rest of that sentence, Your Honor, I'm certain because I have thinks and quotes in my notes, at least. He said that he thinks some elements of the corrosion occurred as a result of the humidity. And that was the most that he could say. If I could back us up just a minute. There's no question there was water intrusion. And let's assume that somebody observed condensation on the packaging of some of these 30-year-old items, various ones that were on the shelves. The connection that's missing here is to tie the condensation to corrosion. And as Mr. I can't say it either, Petluski and all the experts said, there wasn't sufficient evidence. Pyramid didn't keep records. They didn't keep returned items. They didn't keep the items they claimed were damages. To the extent Dr. Kumar was able to conduct tests, whether he came from California or elsewhere, it's a question as far as I'm concerned. The man was clearly qualified. He applied military-grade standards to his testing. And he came to the conclusion that, well, yes, some of the items were corroded, which was to be expected. There were 30-, 40-year-old items on these shelves. No indication of how they'd been packaged or cared for during all the time they stayed in Pyramid's warehouse. Counsel, doesn't that question, doesn't your analysis, Ben, squarely beg why Hartford isn't guilty of bad faith here for inadequately testing and checking the claim? No, Your Honor. I don't think it does at all. I think they're two separate questions. I think we did test. We tested everything they gave us. Everything they identified that they wanted us to test, we did test. And you found some errors or some failures in that test. And wouldn't that show that, frankly, there should have been more testing on a sampling basis, not $13 million? Well, the difficulty, Your Honor, was that this went in progressions. If you digress for a moment to the building claim, which they say is a classic lowball effort on our part that we paid half. I mean, we got substantiated. I'm more worried about the product. Okay. With the products, we sent somebody in to clean up. We asked them for records. They didn't give us records. We said, when did you buy these components? When did you buy those? How did you take care of them? Did you have humidity controls? Did you bake or re-bake these items that were required? How did you package? How did you maintain? How did you differentiate? It was like getting blood from a stone. That may all go to proof of damages, but I don't see how it goes to causation in light of Petluski's testimony. And, by the way, speaking of Petluski and Dr. Kumar that you did send in, Dr. Kumar said that none of the corrosion that he observed could have possibly been caused by the 2005 flood because, in his opinion, that flood would have caused uniform corrosion. Petluski, in his report, and he was not rejected as an expert, says quite extensively on page two of his report, the end of section three, a very detailed description of why corrosion is not uniform, and, therefore, that's why he rejects Kumar. The district court rejected that as not reliable. How so? How is that defensible? I'm not sure that has to be defensible because, ultimately, what the district court did on reconsideration was to say, I find all these problems with all three reports, and I think this one doesn't meet this test, this one doesn't meet that test, but I've read all these reports. And having read them and considered them, my decision would be the same because nobody ties causation to the water intrusion. Counsel, I thought that the district court said that the Petluski report was inadmissible. She did at one stage. The court did say that at one stage. And yet, on reconsideration, when the court went back and looked at the tests, it's clear from the orders that were made that the court looked at all the reports and that the court's concern throughout this process was the failure to establish causation. I thought it was in the motion for reconsideration that she said the report was inadmissible. I can't quarrel with the Court on that if I misread it. I thought as to Petluski, she said on reconsideration that it said nothing about the causation of the test on the tested water. Judge Rawlinson is correct, and she says with respect to the Petluski report, it's inadmissible because it's not the product of reliable principles and methods. She does not reject him as an expert, but she does say his report is inadmissible because it's not the product of reliable principles and methods. And he says Petluski purports to opine on certain aspects of Kumar's report, but no foundation is provided to explain what principles and methods he uses to challenge it. That's what the district judge says. And to be candid with you, counsel, I don't understand that, because Kumar, who Petluski is challenging, says it couldn't have been caused because we would have seen uniform corrosion. Petluski, who is a metallurgist and a materials engineer, gives two very long paragraphs in Section 3 explaining why corrosion does not occur uniform, and therefore, I don't understand why the district court rejected Petluski's report. Your Honor, I don't have an answer for that. I don't know why the Court rejected this, the report. I do believe that the Court nevertheless looked at it and concluded that the more important part of the report was that Mr. Petluski never examined any of the items. He conceded that without more information, he could not opine about causation, and that that was the fundamental issue the district court was concerned. Is that in his report where he said that? He qualifies his deposition testimony in that direction a little bit. But I didn't see that statement, as you presented it, in his report. His report, he used different equivocation words in each one. In one, I believe it was his deposition testimony, he said he thinks. The report conceded that he hadn't examined the items. And personally, I don't see how he could. He didn't examine them. He didn't take into account the different ages of the various items. He didn't take into account which items were packaged differently than others, that there can always be more. I think what Pyramid is asking us, is asking you to do this morning, is to have this Court reevaluate what the district court did, and to say there was a water intrusion. There was water on the floor in the warehouse. Some employees observed water condensation on some packaging on a few items. Therefore, that's enough to create an inference. I thought there were a lot of products that were quarantined. A number that were returned. Two that were tested by Kumar himself that failed. Others that Kumar found had corrosion on them. Now, Kumar says it couldn't have been by the flood. Piotrowski says, yes, it could have, and here's why. Now, they didn't quantify it. There may be a big problem for damages down the road. But am I misunderstanding the record? Well, I don't know that the Court's misunderstanding the record. But to the extent some of the items failed, the test, the problem, again, and I know I sound like a broken record, is it's certainly possible some of the items were corroded. A 30-year-old electronic part that's been sitting on a shelf may well have failed a test to establish whether it worked perfectly today for whatever purpose it was intended. The problem was nobody ever presented any solid evidence tying together the water intrusion as the cause of why that item failed. Well, a different issue. The district judge said that pyramids expert David Spiegel was not qualified as an expert. And she just gave some very general language about it. But Spiegel's qualifications, in addition to being 38 years of experience in property damage repair, he's a certified restorer, certified master restorer, certified water, fire, and odor control journeyman, certified indoor environmentalist from the Indoor Air Quality Association. And we're talking about basically humidity conditions in air. What was the district judge thinking? I don't know. And I suspect, Your Honor, that other judges might not have excluded the report given those considerations. But what matters here, in my view, is that the district court, in its order on the motion for reconsideration, said that the exclusion of the report was in any event nonprejudicial because Mr. Spiegel himself admitted that there was no way to tell how these items were compromised, if at all. He did not identify the specific items he was referring to when he said some might have been compromised. And he never even said whether those items were moisture sensitive. It could have been 30-year-old items that were dying of old age on the shelf before the water entered. Hartford was willing to compensate for any damage that could be proved as caused by the water intrusion. The problem was Pyramid didn't keep careful records. It didn't have humidity controls. It didn't segregate its project, its inventory by year, by type, by anything. It was a huge warehouse with floor-to-ceiling shelves. And it was a free-for-all for guessing what was what. So whose fault is that? I mean, whose duty is it to figure this out? Your client insured them. You certainly had the opportunity, as a condition of the insurance, to come in and say, well, you know, there's a lot of stuff in here, and it appears to be pretty haphazard. Before we want to insure you against any damages here, you've got to be able to do a few more things, or else we're going to charge you a much higher premium. We did that, Your Honor. In the policy, we imposed a condition that obligated Pyramid, as he insured, as part of its duty when it submitted a claim to us to identify with specificity the components that were supposedly damaged, the type of physical damage, and the other conditions that we needed. Could you have denied the claim on that basis alone? Could we have? Yeah. I mean, couldn't we be here arguing over whether they had complied with those terms?  Absolutely. Did you deny it on that basis? We denied part of the claim on the basis of their failure to submit authentication for absolutely. To the extent we then tried, frankly, I think Hartford went out of its way. I mean, I'll be the first to concede to the Court. I've seen a lot of cases where insurance companies act in bad faith. I just don't think this is one of them. Why didn't Hartford do a sampling test, a sample testing, much earlier than it later  Because it had no way to do what it wanted. What happened was we cleaned up the mess. We sent in Belfour. The Court is not impressed with the Belfour report. Pyramid wasn't impressed. Pyramid then came back to us and wanted us to spend $13 million to do a wholesale test of everything in there. And why didn't Hartford say, that's ridiculous, we'll do a sample test? We did say that's ridiculous. We did get half of it. But your inventory is worth about $5 million, so we don't really see the point of spending $13 million to test it. But then it was only some months after that, a few months if I recall correctly, that we did bring in Dr. Kumar, and we did do sampling. Pyramid provided some of the items for testing. Dr. Kumar selected some at random. There were a handful of items that were supposedly quarantined. None of the items that were supposedly returned as damaged after the water intrusion occurred were produced because Pyramid's process was to destroy those items or recycle them, if you will, when they came back. So they no longer existed and couldn't be part of the test. And the test was strictly random. It was a slow process because Pyramid was slow to provide us with the information we needed. I'm sure Hartford would have been happier to move faster if it could have received more time on this. I don't think it acted on bad faith. I don't believe it breached its contract. I think there is no proof here of causation. That some of these products suffered from corrosion is a given. But they were old. That happens. They didn't work. I don't think that anyone came in, either lay witness or expert witness, even after reconsideration was granted, to say, I can point to the water intrusion having caused this bit of corrosion. And if there were one or two items there, it's at best de minimis. And I don't think there was even that. So I'm looking and seeing that my time is evaporating in front of my eyes. Over time, actually. If the Court has no further questions, I would thank you very much for your attention and urge the Court to affirm the judgment. Thank you, counsel. Mr. Bowe. Thank you, Your Honor. By the way, not the 52 million parts were not all 30 years old. The records were submitted through the services of the public insurance adjuster. If the Court wants to take a look at them, everything was detailed beyond detail. It was very, very well done. How much was your inventory worth? How much did Pyramid Technologies think it was worth? I know how much it was sold for. How much did you think it was worth? Well, if you look at the replacement cost value, to replace every one of those items would probably cost about $50 million. And there was evidence to that effect. If you look at it at an actual cash value basis, which is a little different fair market value, obviously you have to look at the age and things of that nature. But this was not all 30-year-old material. This was a constant successful business, by the way. They were turning over product all the time, and their records were not, as Ms. Vogel says, that bad. They were very well organized. Admittedly, some of them were damaged. Even Kumar said that. How much did they pay? Nada. Not a penny. Even admitted, acknowledged that some of the stuff was already damaged. Mr. Kumar, who was paid $144,000 for his opinion, equivocated, and he couldn't tell you one way or the other. He had to admit the fact that they were corroded because he saw them. They were physically in front of him. And Mortensen was there for the examination. I think it was Mortensen who was there for the examination. The reality is that this was valuable product. Ms. Vogel really made the best argument for me. She was talking about all these facts. And the key words in evaluating whether a judge could grant the motion for summary judgment or not is weight versus admissibility. This was a factually intensive case. This was not a simple case. Putting the bad faith part aside for the moment, because those facts speak for themselves, and they're undisputed. I mean, it's clear that it took them two years to do any inspection at all, even though their own guy, Helms, recommended it a year earlier. They did it because all of a sudden they had their quarantine product, and there it was physically in front of them. They couldn't ignore that. And they were looking at the lawsuit by then. We're two-plus years there. An insurance company has an obligation to deal fairly and promptly. They basically drove this company out of business by paying nothing when there was clearly some element. Damages are not the issue for this Court today. And that's an issue that will be determined by a jury, not by the Court. Counsel, you've exceeded your time. Could you wrap up, please? Thank you. Based on all of the above, we believe that the Court should reverse and allow the jury to decide the merits of this case. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the Court.
judges: Simon, Rawlinson, Bybee